**Sandra HAUCK**

v.

**XEROX CORPORATION.**

**Civ. A. No. 77–1718.**

United States District Court,
E. D. Pennsylvania.

July 31, 1980.

Joseph R. Roda, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for plaintiff.

Brenda C. Kinney, Schnader, Harrison, Lewis, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

### FINDINGS OF FACT

1. In January 1968 defendant employed plaintiff as a secretary, the only position then available, in its Harrisburg, Pennsylvania, sales office of the Fort Washington branch. Although plaintiff had no prior sales experience or training, defendant promised to advance her to the position of Customer Representative as soon as an opening occurred.

2. In June 1968 defendant promoted plaintiff to Customer Representative. Her duties included visiting machine installations, training customers in the use and care of Xerox equipment and selling supplies. Defendant neither posted the job nor interviewed any other employees.

3. In March 1971 defendant promoted plaintiff to Area Sales Representative and assigned her to the sales team which served the Pennsylvania government account. Her new duties included selling additional equipment to the Commonwealth of Pennsylvania, promoting the sale of Xerox supplies, ensuring general customer satisfaction and assisting the Sales Representative in selling additional installations or upgrading present placements.

4. Plaintiff's evidence demonstrated that women entered into Customer Service Representative positions and Area Sales Representative positions by direct hire from the outside and by promotion from secretarial positions.

5. Plaintiff remained in the Harrisburg, Pennsylvania, office during her entire employment tenure. In January 1974 the Harrisburg office became a separate branch. While Harrisburg remained a sales office, the sales manager was the most important manager on site.

6. In January 1972 defendant promoted plaintiff to Sales Representative. During the next two years plaintiff reported to three successive sales managers: Dick Jones, from January 1972 until January 1973, Calvin Hauck, from January to March 1973, and John Fillman, from March to August 1973.

7. Sales Manager Calvin Hauck initially interviewed plaintiff in 1968, began dating her in 1969 and married her in 1972. Mr. Hauck enjoyed close personal and business relations with Dick Jones, plaintiff's first sales manager.

8. In August 1973 plaintiff began reporting to John Kammerer, the manager responsible for the sales team serving the Commonwealth of Pennsylvania. In September 1973 Larry Staneart came to Harrisburg as the branch manager and set up the Harrisburg Branch. Plaintiff's complaints concerning her managers began to occur after August 1973, when the branch management located in Harrisburg.

9. Almost as soon as Kammerer became sales manager in Harrisburg, plaintiff complained of problems with him. In October 1973 she complained that she had not been promoted to Senior Sales Representative. A few months later Kammerer recommended her for a promotion to Senior Sales Representative, which she received in January 1974.

10. The promotion of a sales representative to a senior sales representative did not involve any comparative ranking system of sales representatives, and no quota limited the number of sales representatives who could be promoted. Rather, the sales manager ensured that candidates met minimum eligibility tenure requirements and maintained normal, reasonable sales performance.

11. Plaintiff complained that defendant promoted three men to Senior Sales Representative ahead of her in October 1973. However, the evidence showed that defendant promoted plaintiff to Senior Sales Representative in January 1974 after only twenty-five months as a sales representative. One male sales representative worked for thirty-nine months and another for thirty-one months before defendant promoted them in October 1973. The third received his promotion after twenty-three months. Thus, defendant promoted plaintiff sooner than two male sales representatives and within one month of a third. If plaintiff had been promoted in October 1973 as she desired, she would have been promoted ahead of all three males.

12. Defendant maintained a system of annual written employee performance appraisals, prepared by the employee's direct supervisor who reviewed it with the employee and asked him/her to sign it.

13. Defendant also developed a program, Human Resource Planning (HRP), a process for identifying promotable individuals. Specifically, the HRP was a written document prepared by the employee and his/her direct supervisor after career-counseling discussions concerning the employee's interests, career goals and the appropriate path to attain them.

14. The employee signed the HRP, copies of which defendant retained at both the branch level and regional office. The HRP documents contained places for notations that candidates were "ready now", "ready within one year" or "reading within two years" for promotions, which were not automatic. The document, part of a planning process, made projections which assumed on the candidate's part consistent and above average performance, no change in career goals, completion of necessary development criteria and a vacancy for the desired position.

15. In October 1973 plaintiff and Kammerer, her manager, met and discussed her career goals in preparing an HRP. Plaintiff testified that she told Kammerer she wanted to be an account manager and a sales manager ultimately. They listed both of these positions and a third one, Field Service Manager (FSM), on the form. Plaintiff signed the document after again reviewing it with Kammerer. Plaintiff did not show that this HRP process with Kammerer differed in any manner from the one used with male employees.

16. In June 1974 Kammerer made a written performance appraisal of plaintiff, who testified that Kammerer's secretary handed her a typewritten copy and asked her to sign it. Plaintiff refused because the weighted appraisal "3.6" had not been rounded up to a "4". Upon her return to the office plaintiff testified that she discovered the appraisal had been changed to a "3.2". Nevertheless, plaintiff signed it and did not make any written comments on the form.

17. Defendant had no consistent corporate policy on rounding performance appraisal ratings either up or down. Defendant adduced many examples where defendant rounded *down men's* and rounded *up women's* ratings. Plaintiff failed to introduce evidence to demonstrate that the change in rating or rounding down differed from treatment to males with respect to their performance appraisals. Moreover, during depositions plaintiff admitted that she did not know defendant's policy on rounding, and in a subsequent performance appraisal in December 1975, plaintiff's rating was raised.

18. In her June 1974 performance appraisal plaintiff achieved only 57% of her net additional budget and 78% of equipment revenue budget, the two most important and heavily weighted budget components. Branch Manager Staneart testified that these figures indicated substandard performances which could easily have been rated "2" and clearly did not deserve higher than a "3".

19. Plaintiff complained that Kammerer did not travel with her or assist her adequately in serving the Pennsylvania Department of Transportation account, the success of which directly affected his own performance rating. In fact, a sales manager's own compensation and appraisal depended on how well each sales representative on his team performed. Plaintiff complained that Kammerer insulted her Penn Dot contact but later admitted that Kammerer apologized and arranged to take him on business luncheons, dinners and golfing outings. Staneart witnessed this incident and testified that Kammerer had not acted improperly and that Kammerer worked hard to solidify the Penn Dot account through business trips, entertainment and other means.

20. Plaintiff also complained about her next sales manager, Ed Donald, to both Staneart and Kammerer, who requested plaintiff to document any problems she had working with Donald. Plaintiff failed to do so.

21. Upon receipt of her June 1974 performance appraisal, plaintiff bypassed normal supervisory channels and called Staneart, her branch manager, at his home to complain about Kammerer. Threatening to resign, plaintiff, a neighbor and close social friend of Staneart and his wife, also visited him that evening to complain again about Kammerer. Plaintiff told Staneart that she could no longer work for Kammerer. Staneart urged her to reconsider, assured her he would try to accommodate her wishes, then arranged for her to be placed on the team of Sales Manager Bill White and assigned her to Lancaster, the specific assignment requested by plaintiff and the only available territory at that time.

22. Plaintiff was the only sales representative who violated the normal chain of command and the only one who ever visited the branch manager's home to discuss personal career development.

23. Defendant gave White no choice but to accept plaintiff on his sales team despite the fact that he did not believe she had the skills to handle this territory, which he had served formerly, and defendant had previously promised the Lancaster territory to a male sales representative, Trent Smith, whose excellent background and prior experience as a sales representative defendant deliberately ignored in order to give the territory to plaintiff.

24. Normally defendant assigned territory openings to sales trainees and discouraged changing territories and sales teams. Reassigning plaintiff to White's team in July 1974 represented a special accommodation in response to her request.

25. Plaintiff had problems with White as soon as she transferred to his team. She

testified that he failed to travel with her and introduce her to his former accounts. However, White repeatedly offered his assistance if she needed it. White did not travel with many males on the sales team, and Staneart testified that an experienced sales representative would normally not travel with his/her manager more than once a month. At the time, plaintiff never complained to her managers about White's alleged failure to travel with her. Plaintiff admitted that other males on White's sales team experienced similar problems with him, and questions concerning the efficacy of his management affected not only her but also eight other employees.

26. In the fall of 1974 defendant filled three telecopier sales positions and plaintiff complained to White that she should have been given an opportunity to interview for them. However, plaintiff refused to consider one position located in Williamsport because she did not desire to travel that far away from home. White offered to arrange for plaintiff to interview for the other opening, but she declined. The telecopier sales position, a different job from the telecopier specialist position in which plaintiff had previously expressed interest, would have constituted a lateral transfer for plaintiff, not a promotion. Plaintiff discussed the telecopier sales position with Roger Vernier, the branch sales manager, who explained that a *specialist* position would be a promotion, but merely changing product lines to a telecopier *sales* job would not.

27. With no company policy concerning notice of openings for any type of sales representative position, defendant did not post telecopier sales representative openings.

28. In January 1975 defendant promoted plaintiff to Sales Executive.

29. Defendant's upper management assigned targeted sales goals or budgets for the entire territory to each sales manager, who then allocated his/her overall budget among the members of the sales team, according to respective sales territories. Separate goals existed for net addition, supply and high volume incentive budgets. The net addition portion of the budget received most and the supply budget least weight.

30. Plaintiff complained that the targeted selling budget for the Lancaster territory was too high. White, her sales manager, testified that he, too, believed that the *overall* budget assigned to him was unrealistically high, and he later succeeded in having the overall budget reduced for the last half of 1975. White further testified that he did not establish a budget unique to plaintiff; he budgeted the territory based on historical percentages and on his own familiarity with it as a former sales representative therein.

31. Increased budgets every year prompted many sales representatives to complain. In fact, as a sales representative in Lancaster, White himself had complained about his budget to his sales manager. The high budget assigned to White affected all members of his team, male and female, and did not uniquely affect plaintiff.

32. With respect to budgets plaintiff did not present any evidence of different treatment afforded to male sales representatives.

33. Defendant developed special regional and national female affirmative action programs and guidelines. The regional female affirmative action manager, Susan Greenwell, followed the careers of various women in the region and in the Harrisburg branch. One of the program's objectives was to get more women into management.

34. In July 1975 plaintiff attended a Xerox conference in Arlington, Virginia, where she met the Regional Personnel Manager Bruce Rismiller and told him she would commit to sales management. Plaintiff testified Rismiller told her she was the leading female candidate for sales manager in the region. Rismiller denied this assertion and said he told her defendant viewed her as a possible sales manager candidate within two years if she would commit to sales management. Both he and Greenwell denied telling plaintiff that she was the leading female candidate.

35. Defendant never gave plaintiff any guarantee that she would be a sales manager within one year from July 1975. In any event plaintiff resigned in April 1976 before this one-year period ended.

36. Plaintiff seemed confused about her long and short term career ambitions. She changed her goals repeatedly in HRP and career counseling sessions. Finally, in mid-1975 plaintiff firmly committed herself to pursue a sales manager's position. Previously, plaintiff admitted hesitancy in seeking management positions.

37. Initially, plaintiff expressed interest in the National Account Manager (NAM) position but later changed her mind. The only NAM vacancy occurred in June 1974 while plaintiff was on leave trying to decide whether to resign. Plaintiff did not request to interview for this NAM position, which required reporting to Kammerer, which plaintiff refused to do. Plaintiff never applied for any NAM position while with defendant.

38. Plaintiff would not relocate to defendant's other offices or branches and did not want to travel extensively away from home. She expressed interest only in promotions within the Harrisburg branch. Plaintiff failed to produce any evidence of males who similarly restricted their promotion opportunities by declining to relocate.

39. In the fall of 1975 plaintiff exchanged territories with a male sales representative and began to serve Dauphin County. Plaintiff had told Staneart and Rismiller that the long drive to Lancaster presented a problem for her. Plaintiff welcomed the switch because of the shorter distance.

40. Plaintiff presented no evidence that the Lancaster territory was less desirable or had less potential while she served it. On the contrary, the male who succeeded her had a more burdensome territory following the changes because defendant added thereto accounts which imposed an increased onus on the sales representative.

41. In September 1975, as part of the female affirmative action program, defendant held a videotaping program in Rochester, New York, and invited plaintiff to participate. Notice of the taping did not reach the Harrisburg branch in a timely fashion and Vernier, the branch sales manager, decided that plaintiff should not attend because of the short notice and her indispensability within her territory at that time. Staneart concurred in this determination after calling the regional and national affirmative action managers and learning that the session was not a training one for plaintiff's own development.

42. Defendant had permitted plaintiff to attend numerous previous conferences when more advance notice had been given to the branch. Plaintiff had been invited specifically to participate in Employee Communications meetings, where employees raised complaints to regional management without local branch interference. Staneart told plaintiff there would be other such conferences which could benefit her personal career development in the future and that the branch would continue to get her into these programs.

43. Staneart directly involved himself in career counseling with plaintiff, met with her on several occasions and helped her explore various management goals and career paths. He arranged for her to meet with technical, service and administrative managers in Harrisburg and to explore many opportunities. Plaintiff repeatedly changed her goals during these career-counseling sessions.

44. The branch sales manager, not the branch manager, counseled sales representatives. Vernier came to Harrisburg as the branch sales manager in November 1974 and thereafter Staneart involved *him* in career counseling plaintiff. Vernier assisted plaintiff in exploring management opportunities and discussed a specific career development plan for her with Staneart and Greenwell, the regional female affirmative action director.

45. Both Staneart and Vernier monitored White's performance in working with plaintiff. White, as part of affirmative action, prepared an extensive development program for her. In fact, White's own performance was evaluated, in part, on how

well he managed plaintiff and performed his affirmative action duties.

46. Staneart also gave plaintiff favorable charge-back relief on several occasions as a special favor to her. Staneart did not afford male sales representatives this special treatment, an exception to normal company policy.

47. In December 1975 plaintiff received a performance appraisal from White of "2". She had achieved only 34.6% of net addition budget and 62.7% of supply budget. Despite this poor showing a new sales manager reviewed the appraisal and raised it to a "3". Plaintiff presented no evidence that males ever received the favorable treatment afforded plaintiff, although males also expressed dissatisfaction from time to time with their ratings.

48. Plaintiff interviewed for an 800 Electronic Typing System (ETS) position in January 1976. Defendant selected White, a former sales manager, for one vacancy and for the other Charles Siford, who had extensive prior selling experience and formed part of a premium hire program. Both men had greater experience than plaintiff. The 800 ETS position, another sales representative position, would not have been a promotion for plaintiff.

49. In January 1976 Staneart left Harrisburg for another branch. A factor motivating plaintiff to resign was the fact that Staneart, her friend, had left the branch and could no longer help her as he had.

50. When plaintiff decided to resign in March 1976, she met with Greenwell, who tried to dissuade her. Rismiller and Vernier also held discussions with plaintiff to prevent the resignation.

51. Plaintiff submitted her resignation to Harrisburg management, who again urged her to reconsider and remain with defendant. At no time during the exit interview process did plaintiff allege that she had been discriminated against because of her sex.

52. Only one person, Greenwell, ever used the word discriminate in connection with plaintiff or any other female employee, and Greenwell defined discrimination in terms of inconsistent or poor management. Neither Greenwell nor Rismiller ever received any other complaints of discrimination against women in Harrisburg. Greenwell never told the national female affirmative action manager, Monica Bauer, that plaintiff had been treated unfairly or discriminated against and never used this word in any conversation with Staneart.

53. After plaintiff resigned from defendant in April 1976 she made no attempt to seek alternative employment. In September 1977 she began her own business.

54. Four separate factors affected the total compensation of sales representatives and sales managers: base salary, commissions, bonus and special incentives. Salaries varied widely within a range for each sales position; ranges overlapped. Various factors unique to each sales representative also affected these components. The total compensation package varied from year to year, including the percentage of plan which had to be achieved and the percentage credited to salary, bonus or commission. Separate compensation plans existed for different sales representatives, depending upon the type of product being sold, and these compensation plans changed from time to time.

55. Starting salaries for entry level sales representatives varied depending upon the new hiree's former experience and background, his/her ability to negotiate, educational background, performance in the hiring interviews and whether defendant hired the candidate as a "premium hire". The base salary ranges also changed, depending on inflationary changes, cost of living increases and general changes from time to time in the ranges.

56. Bonuses varied with the plan of a particular sales representative and varied with the position or bonus base, which in turn varied from one for a senior sales representative, sales executive or senior sales executive.

57. Commissions depended on the skill of the individual sales representative, his/her performance and ability to earn commissions varied widely.

58. Territories assigned to sales representatives varied widely in types and number of potential customers and whether the territory was already heavily penetrated or saturated with equipment. These variances affected a sales representative's earnings. The business climate, recession and inflationary problems varied within the territories from year to year. Defendant also reconfigured territories from time to time and added or deleted accounts.

59. Base salaries varied where they were "personalized" for particular reasons. For example, if defendant demoted an employee because of a reduction in allocated positions or redeployment, his/her salary would be tailored to the former position. Base salaries also varied, depending upon the employee's anniversary date of hire.

60. Salary increases and merit increases directly related to the individual sales representative's attainment of his/her budget. Budgets differed from employee to employee, depending upon the territory to which they had been assigned.

61. Because of the large number of variables and the relations of compensation to an individual's skill and effort, no accurate or reliable projections could be made of potential earnings in particular positions.

62. Plaintiff complained to Greenwell that her compensation was not comparable to other sales representatives in the branch. Greenwell investigated the complaint with the region compensation manager and concluded that no inequity existed.

63. Plaintiff had no knowledge of the compensation of other sales representatives in Harrisburg while she was one. She also had no knowledge of the compensation of other senior sales representatives while she held that position.

64. Branch management in Harrisburg did not discriminate against plaintiff. On the contrary, the branch manager, branch sales manager, and sales managers with whom plaintiff worked consistently attempted to work with her, to counsel, assist and aid her in progressing rapidly toward her career goals.

## CONCLUSIONS OF LAW

1. Failure to file timely charges of discrimination with the Equal Employment Opportunity Commission and receipt of a notice of the right to sue deprives a federal court of jurisdiction to hear a plaintiff's claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII). *See Glus v. G. C. Murphy Co.,* 562 F.2d 880 (3d Cir. 1977) and *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975).

2. As remedial and humanitarian legislation, Title VII should be construed liberally. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). Where blind allegiance to procedural technicalities would subvert the essential purpose of Title VII, elimination of sex discrimination in the workplace, allowing a plaintiff some latitude in compliance therewith may become necessary to accomplish that purpose. *See Sanchez v. Standard Brands, Inc., supra* (failure to complete EEOC form properly) and *Bluebell Boots, Inc. v. EEOC,* 418 F.2d 355 (6th Cir. 1969) (failure to verify charges under oath) *and compare with Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) (cautioning against creation of additional procedural technicalities).

3. Although plaintiff did not introduce *at trial* evidence that she complied with these prerequisites, her post-trial affidavit establishing this information will suffice to confer jurisdiction under Title VII where, as here, plaintiff showed that she filed her charge with the EEOC within two months after resigning from defendant (and therefore within 180 days from the last alleged act of discrimination), that she obtained a Right to Sue letter from the EEOC and that she filed this action within ninety days thereafter.

4. Plaintiff failed to prove by a preponderance of the evidence that defendant discriminated against her.

5. Initially plaintiff had the burden of proving a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

6. Plaintiff failed to establish a *prima facie* case that defendant discriminatorily denied her promotion and advancement in view of these facts: She failed to prove her qualifications to be a manager. She failed to prove that she applied for any management vacancies. She resigned before she had achieved sufficient tenure and experience to be considered for management. She received five promotions in six years. Defendant promoted her more rapidly than many males. She failed to prove defendant promoted males more rapidly than she.

7. Plaintiff failed to establish a *prima facie* case that defendant discriminatorily denied her proper assistance from her supervisors in view of the fact that she failed to prove males received greater assistance.

8. Plaintiff failed to establish a *prima facie* case that defendant discriminatorily altered her employment records in view of the fact that she failed to prove defendant did not alter males' employment records similarly.

9. Plaintiff failed to establish a *prima facie* case of discrimination with respect to increases in her budgets and changes in territory assignments in view of the evidence showing that defendant increased budgets and changed territory assignments of many male sales representatives.

10. Plaintiff failed to establish a *prima facie* case of discrimination with respect to her performance appraisals and changes in them in view of the evidence that plaintiff and other females had appraisals rounded up and that males had appraisals rounded down.

11. Plaintiff failed to establish a *prima facie* case of discrimination with respect to compensation under Title VII because she failed to introduce evidence of comparative compensation of males.

12. Plaintiff failed to establish a case of discrimination with respect to compensation under the Equal Pay Act because the evidence showed not only that the positions of sales representative were not jobs of equal work, the performance of which required equal skill, effort and responsibility but also that defendant based compensation on merit, quality and quantity of production and other factors including percentage achievement of budget, territorial assignments, compensation plan and starting salary, which in turn varied with prior experience, education, selling and inflationary considerations.

13. Assuming momentarily that plaintiff established a *prima facie* case of discrimination, defendant adequately met any burden which then shifted to defendant to "articulate" legitimate and nondiscriminatory reasons for its actions. Defendant needed only to "articulate", not "prove", legitimate and nondiscriminatory reasons. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). Once defendant articulated such a reason, the burden shifted back to plaintiff to prove that this reason was "pretext". *Board of Trustees of Keene State College v. Sweeney, supra, McDonnell Douglas Corp. v. Green, supra.* Ultimately, plaintiff needed to establish, in a disparate treatment case such as the present one, that defendant had a discriminatory motive. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

14. Even if plaintiff established a *prima facie* case of discrimination, defendant successfully rebutted that showing by articulating legitimate and nondiscriminatory reasons for its conduct.

15. Defendant articulated legitimate and nondiscriminatory reasons for not making plaintiff a national account manager because plaintiff did not want to work for the boss who supervised the NAM position and did not apply for the NAM opening in June 1974. No other NAM vacancy occurred while defendant employed plaintiff.

16. Defendant articulated legitimate and nondiscriminatory reasons for not selecting plaintiff as telecopier sales representative because the position differed from the telecopier *specialist* position sought by

plaintiff and she declined to interview for the job which did not constitute a promotion.

17. Defendant articulated legitimate and nondiscriminatory reasons for the territory assignments given plaintiff. Defendant proved that the territories had been held by both male and female sales representatives and that it assigned these territories to her upon request.

18. Defendant articulated legitimate and nondiscriminatory reasons for plaintiff's performance appraisals based upon her attainment of projected budgets.

19. Defendant articulated legitimate and nondiscriminatory reasons for not permitting plaintiff to attend the Rochester conference. Defendant had not received timely notice thereof; plaintiff could not be spared from her territory at the time; and evidence showed defendant permitted plaintiff to attend numerous other conferences.

20. Defendant articulated legitimate and nondiscriminatory reasons for not selecting plaintiff as an 800 ETS sales representative. Defendant chose individuals with much more experience than she.

21. Defendant articulated legitimate and nondiscriminatory reasons for plaintiff's treatment and assistance by managers Kammerer and White by demonstrating that they treated males in the same manner.

22. Plaintiff failed to demonstrate that the legitimate and nondiscriminatory justifications articulated by defendant for its actions were pretext.

23. Plaintiff failed to prove by a preponderance of the evidence that defendant discriminated against her on account of her sex or that defendant acted with a discriminatory motive.

24. Judgment will be entered in favor of defendant and against plaintiff.

25. Defendant's request for counsel fees and costs will be denied.